UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD H. FAGAN,<br><br>            Plaintiff,<br><br>      v.<br><br>R. GROUNDS, Warden,<br><br>            Defendant. | No. 1:12-cv-01681-SKO  HC<br><br>**ORDER DENYING PETITION**<br><br>**FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] Petitioner asserts a due process violation arising from the trial court's order, pursuant to Cal. Penal Code § 1370, for forcible administration of antipsychotic medication, contrary to the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

**I.      Procedural and Factual Background**

The California Court of Appeal, Fifth Appellate District, summarized the factual and procedural history:

> On March 25, 2006, [Petitioner] was serving a less than life sentence at Wasco State Prison.  John Simpson, a correctional lieutenant, opened [Petitioner's] cell door to speak with him about

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented, in writing, to the jurisdiction of a United States Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.

1

refusing a cellmate. [Petitioner] advanced on Simpson. Simpson extended his arm and directed [Petitioner] to halt. [Petitioner] pushed Simpson's arm aside and struck Simpson in the face. The blow broke Simpson's nose and necessitated surgical repair.

Criminal proceedings were suspended twice in 2007 pursuant to Section 1368[2] and again in March 2008 when [Petitioner's] competency was questioned. In March 2008, the examining doctors reached different conclusions regarding his competency, so the matter was set for hearing and additional doctors were appointed to examine [Petitioner]. During that hearing, [Petitioner] was removed from the courtroom for disruptive behavior.[3] At the subsequent competency hearing, counsel submitted the issue on "the report" of Thomas P. Middleton, Ph.D. The court found [Petitioner] was not competent based on Dr. Middleton's report of May 27, 2008, and referred the matter to Robert Sincoff, M.D., for a medication recommendation.

Dr. Middleton's report stated that he had examined [Petitioner] in 2007 and found him competent. On May 27, 2008, when he attempted to examine him again, [Petitioner] appeared agitated, accusatory, angry and loud. He was "medication noncompliant." He was unable to provide rational answers to the doctor's questions and "loudly and rigidly" made demands, but was "not able to justify them." A review of his records indicated that [Petitioner] had been in custody since 1991; he had been treated at state hospitals and, at times, would discontinue his medications and "decompensate." Staff considered him a serious security threat. His diagnoses were paranoid schizophrenia, polysubstance dependence and antisocial personality disorder. Progress notes indicated he was "compliant with medication" in December 2007, but had "refused sick call" about once a month since then. [Petitioner] had been prescribed Prozac, Depakote and Geodon on May 21, 2008. The report noted that correctional mental health staff described [Petitioner] as one of the most agitated and chronically aggressive inmates they had seen at the facility. Dr. Middleton concluded that [Petitioner] was not competent to stand trial. He needed ongoing psychiatric treatment. He was a danger to himself and others and, without treatment, he would continue to suffer physical and psychological harm.

Dr. Sincoff's report of June 25, 2008, stated that involuntary psychotropic medication was medically appropriate. [Petitioner] was diagnosed with schizophrenia and needed medication to stabilize symptoms such as delusions. There was no specific medication currently prescribed because [Petitioner] was refusing medication. There was a substantial likelihood that he would be restored to competency if medicated and a substantial likelihood that he could not be restored to competency without medication.

---

[2] All references are to the California Penal Code.

[3] As he was being removed, he said, "get your f…ing hands off me, f…ing homosexual. Get your f…ing hands off me, bitch."

Dr. Sincoff was unaware of the past efficacy of antipsychotic medications but, given [Petitioner's] diagnosis and clinical presentation, treatment with antipsychotic medications was indicated. The potential side effects of these medications were drowsiness, dry mouth, constipation, blurry vision, difficulty urinating, muscle stiffness, slowed movements, tremor, restlessness, dizziness, weight gain and abnormal involuntary movements. These side effects were unlikely to significantly interfere with [Petitioner's] ability to assist in his defense at trial.

At the June 30, 2008, hearing, the court found that involuntary psychotropic medications were medically appropriate for [Petitioner] based on the report of Dr. Sincoff. During the hearing, [Petitioner] ignored the court's admonition not to speak, saying: "I'm not going to take no medication. I need love. That's what I need. I'm a basketball player and an athlete. I don't do drugs. I don't need drugs. [¶] . . . [¶] . . . Based on my life, I don't need ---." At that point, the court had him removed from the courtroom. The court committed [Petitioner] to the Department of Mental Health pursuant to sections 1370 and 1370.1 until he was restored to competency, placed him at Patton State Hospital and ordered that "the treatment facility may administer antipsychotic medication to the defendant as prescribed by the treating psychiatrist." (Full capitalization omitted.)

Almost two years later, on June 18, 2010, [Petitioner] was returned to court with a certificate of competency. The accompanying report stated that [Petitioner] was prescribed Lithium Carbonate and Geodon and had been compliant in taking the medications. The report concluded, "[Petitioner] should continue to take his psychiatric medications after discharge from this facility; it is believed that his failure to take psychiatric medications, which have controlled his mental illness so well at SVPP,[4] is responsible for his regressing to the decompensated state in which he purportedly committed this instance offense. There is a real danger that [Petitioner] will become a danger to himself or others should this psychiatric medication be discontinued." The same defense attorney who represented [Petitioner] in 2007 and 2008, represented him in 2010.

A three-day trial took place in August 2010. At trial, there was no mention of [Petitioner's] medication status. The record does not indicate whether the jail psychiatrist prescribed the same medications for him or whether he took them or refused them. Further, [Petitioner] did not testify at trial. The only appearance he made on the record was when he waived his right to a jury trial on the issue of his prior convictions. [Petitioner] presented no evidence. Defense counsel argued the jury should find [Petitioner] not guilty because he believed the prison erred in trying to place another inmate in his cell given his single-cell status. And, in striking Officer Simpson, he was simply defending himself from the five correctional officers who entered his cell. The jury found [Petitioner] guilty of the lesser offense on count 1 of misdemeanor

---

[4] Salinas Valley Psychiatric Program (Department of Mental Health)

assault and guilty as charged on count two of battery. He was later sentenced to a term of 25 years to life.

*People v. Fagan*, No. SF013561A at *2-5 (Cal.Ct.App. Apr. 3, 2012) (Lodged Document 7).

The Court of Appeals addressed three questions: (1) whether sufficient evidence supported the order for involuntary administration of antipsychotic drugs; (2) whether Petitioner's right to due process was violated because forced medication impaired Petitioner's defense at trial; and (3) whether specific prior offenses constituted serious crimes for purposes of California's Three Strikes Law. It concluded that Petitioner's challenge to involuntary medication determination itself was untimely and that Petitioner failed to demonstrate that forced medication impaired his defense. On June 13, 2012, the California Supreme Court denied review.[5]

On October 12, 2012, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. On February 13, 2013, the Court dismissed the state claims set forth in the petition, including the three strikes claim, without leave to amend and directed Respondent to answer the petition. Respondent answered the petition on May 14, 2013; Petitioner filed a traverse on June 6, 2013.

The parties do not dispute jurisdiction, venue, or service.

## II.  Standard of Review

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner can prevail in a habeas action only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[5] Because the California Supreme Court summarily denied review, the Court must "look through" the summary denial to the last reasoned decision, which is, in this case, the opinion of the California Court of Appeal, Fifth Appellate District. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. To do so, a court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy because even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

///

### III. Discussion

#### A. Federal Law Governing Involuntary Administration of Antipsychotic Drugs

Federal law governing involuntary administration of antipsychotic medication had its genesis in *Washington v. Harper*, in which the Court addressed a prisoner's due process challenge to a prison regulation authorizing forcible medication of a mentally ill inmate who was "gravely disabled or pose[d] a likelihood of serious harm to himself, others, or their property." 494 U.S. 210, 215 (1990). After initially defining the issue as "whether a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs against his will" (*Id.* at 213), the Supreme Court recognized that Harper's challenge raised both a substantive issue of what facts must exist before a State may administer antipsychotic drugs to an unwilling prisoner and a procedural issue of whether the State's nonjudicial process to evaluate the facts of an individual case sufficiently protected the prisoner's rights. *Id.* at 220.

The Supreme Court recognized that under the Due Process Clause of the Fourteenth Amendment, prisoners had a liberty interest in avoiding nonconsensual administration of psychotropic drugs. The liberty interest arose both from the drugs' potential mind-altering effects and from significant side effects associated with antipsychotic medications. *Id.* at 229-30. It rejected Harper's contention that the State could not involuntarily administer antipsychotic drugs to him unless he was first found to be incompetent. *Id.* at 222.

The majority concluded that a prisoner's liberty interest must be evaluated in the context of his or her confinement. *Id.* at 222. When a prison regulation impinges on a prisoner's liberty interests, a court must "reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition the prison authorities are best equipped to make difficult decisions regarding prison administration." *Id.* at 223-24. To evaluate the propriety of any regulation infringing on a prisoner's rights, including fundamental rights, a court must determine whether the regulation is "reasonably related to legitimate penological interests." *Id.* at 223. Factors relevant to the determination include (1) "a valid, rational connection" between the regulation and the legitimate penal interest advanced as justification; (2) the regulation's impact on guards, other inmates, and the allocation of prison

6

1  resources; and (3) the existence or absence of reasonable alternatives other than involuntary

2  medication. *Id.* at 224-25. Prison officials need not consider and reject "every conceivable

3  alternative method of accommodating the claimant's constitutional complaint." *Id.* at 226

4  (quoting *Turner v. Safley,* 482 U.S. 78, 90-91 (1987).

5         The Court found Washington State's regulation permitting involuntary administration of

6  antipsychotic drugs constitutional. *Harper*, 494 U.S. at 226. Having deprived prisoners of their

7  liberty, the State has an obligation to provide them with medical treatment consistent with the

8  needs of both the prisoner and the institution. When a prisoner's mental illness results in a

9  significant threat to himself or others, the State's interest in decreasing the risk to others creates a

10  legitimate interest in providing medical treatment. *Id.* at 225-26. In such cases, involuntary

11  administration of antipsychotic medication is a rational means of ensuring the safety of the

12  prisoner and of prison personnel and other inmates. *Id.* at 225. "[G]iven the requirements of the

13  prison environment, the Due Process Clause permits the State to treat a prison inmate who has a

14  serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to

15  himself or others and the treatment is in the inmate's medical interest." *Id*. at 227. The Court

16  rejected Harper's contention that due process required a competency proceeding in court, finding

17  that it did not accommodate the legitimate state interest in treating and controlling a prisoner's

18  dangerous or severe mental illness. *Id.* at 226-27. It concluded that medical treatment decisions

19  were best made by physicians, not judges. *Id.* at 231.

20         In *Harper*, the Supreme Court addressed involuntary antipsychotic medication of a

21  prisoner based on a dangerousness standard. Thereafter, in *Riggins v. Nevada*, the Court

22  considered involuntary antipsychotic medication of a detainee during his trial. 504 U.S. 127

23  (1992).

24         Shortly following his arrest as a murder suspect in late November 1987, Riggins

25  voluntarily took antipsychotic medication to alleviate auditory hallucinations and insomnia. *Id.* at

26  129. Dr. R. Edward Quass, a private psychiatrist who treated jail prisoners, initially prescribed a

27  conservative dose of 100 mg. daily. *Id.*

28  ///

Three court-appointed psychiatrists, who had examined Riggins while he was taking doses totaling 450 mg. of Mellaril daily, testified at a January 1988 competency hearing.[6] *Id.* at 130. Dr. William O'Gorman, who had previously treated Riggins for anxiety in 1982, and Dr. Franklin Master both opined that Petitioner was competent to stand trial. Dr. Jack Jurasky opined that Riggins was incompetent. The trial court determined that Riggins was "legally sane and competent to stand trial." *Id.*

In June 1988, as his trial approached, Riggins moved to discontinue the medication, contending that changes in demeanor and mental state caused by his continuing medication during trial would violate his due process rights. *Id.* at 130. Riggins argued that continuing to take the medication during trial would affect his demeanor and mental state in a manner that would deny him due process. *Id.* He also argued that, since he was pleading not guilty by reason of insanity, the jurors had a right to observe his "true mental state."[7] *Id.*

At a July 1988 evidentiary hearing, Dr. Master "guess[ed]" that taking Riggins off medication would not noticeably alter his behavior or render him incompetent to stand trial. *Id.* Dr. Quass testified that Riggins would be competent even if he discontinued Mellaril, but that the effects of Mellaril would not be apparent to the jury if he continued to take it. *Id.* Dr. O'Gorman opined that Mellaril made Riggins calmer and more relaxed but could also make him drowsy. *Id.* at 131. He declined to predict Riggins' behavior if he were allowed to discontinue Mellaril completely, but questioned Riggins' need for the high dose that he was then receiving. *Id.* In a written report, Dr. Jurasky again opined that Riggins was incompetent to stand trial and predicted that allowing Riggins to discontinue Mellaril could cause him to regress into psychosis and render him "extremely difficult to manage." *Id.* The trial court summarily denied Riggins' motion, and Riggins received antipsychotic medication (800 mg.) throughout his trial. *Id.* at 131-32. The parties agreed that after Riggins' motion to discontinue medication had been denied, continued administration of antipsychotic drugs became involuntary.

---

[6] Conviction of an incompetent defendant violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Nevada law precluded trial of an incompetent defendant. *Riggins*, 504 U.S. at 130.

[7] Because Riggins did not raise this issue before the Nevada courts, the Supreme Court did not substantively address it. *Riggins*, 504 U.S. at 133.

The Supreme Court reversed Riggins' conviction and remanded for a new trial. *Id.* at 138. The Court found that the trial court failed to acknowledge Riggins' liberty interest in freedom from unwanted antipsychotic medication and failed to determine the propriety of continued medication and the availability of reasonable alternatives to medication. *Id.* at 136-37. The Court acknowledged that involuntary medication could have impaired Riggins' constitutionally protected rights, including the substance of his testimony, his interaction with counsel, or his understanding of the trial. *Id*. at 137. Nonetheless, Nevada could have satisfied due process if the prosecution had demonstrated, and the trial court had found, the medical appropriateness of antipsychotic medication and, considering any less intrusive alternatives, the necessity of continued medication for the safety of others. *Id.* at 135. Because the trial court failed to articulate the basis of its determination, the Court had no basis for determining whether any prejudice resulting from continued medication was justified. *Id.* at 138.

In concluding that prejudice likely resulted from Riggins' being medicated during trial, the Court relied heavily on the physicians' testimony:

> Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of trial might be different if Riggins' motion [to discontinue taking antipsychotic medication] had been granted would be purely speculative. We accordingly reject the dissent's suggestion that Riggins should be required to demonstrate how the trial would have proceeded differently if he had not been given Mellaril.  Like the consequences of compelling a defendant to wear prison clothing or of binding and gagging an accused during trial, the precise consequences of forcing antipsychotic medication upon Riggins cannot be shown from a trial transcript. *What the testimony of doctors who examined Riggins establishes, and what we will not ignore, is a strong possibility that Riggins' defense was impaired due to the administration of Mellaril.*

*Id.* at 137 (emphasis added).

Eleven years later, in *Sell v. United States*, the Supreme Court addressed the question of whether the Constitution "permits the Government to administer antipsychotic drugs to a mentally ill criminal defendant--in order to render the defendant competent to stand trial for serious, but nonviolent, crimes." 539 U.S. 166, 170 (2003). The Court construed *Harper* and *Riggins* to "permit[] the Government involuntarily to administer antipsychotic drugs to a mentally ill

9

defendant facing serious criminal charges in order to render the defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and taking account of less intrusive alternatives, is necessary significantly to further important government trial-related interests." *Sell*, 539 U.S. at 179.  Situations in which antipsychotic medications may be involuntarily administered "may be rare" under the *Sell* standard.  *Id.* at 180.  In most cases, the court must find that (1) important governmental interests are at stake; (2) involuntary medication of the defendant will significantly further the government's interests; (3) involuntary medication is necessary to further those interests; and (4) administration of antipsychotic drugs is medically appropriate.  *Id.* The Court need not apply the four-part standard if forced medication is appropriate for a different purpose, including the defendant's dangerousness, or when the defendant's "refusal to take drugs puts his health gravely at risk." *Id.* at 181-82.  California has conformed its statutory procedures under Cal. Penal Code § 1370 to require its courts to apply the *Sell* analysis when determining whether to enter an order for involuntary administration of antipsychotic medication.  *See People v. O'Dell*, 126 Cal.App.4th 562, 568 (2005).

**B.     Involuntary Administration of Antipsychotic Drugs to Petitioner**

On March 7, 2008, Petitioner's counsel Benjamin Nkwonta filed a declaration indicating that he had developed doubts regarding Petitioner's competence to stand trial.  *See* Motion to Suspend Proceedings, Lodged Doc. No. 1 at 123.  Noting Petitioner's diagnosis of schizophrenia and his long history of mental health treatment, Nkwonta explained "I believe his mental illness has deteriorated drastically to a degree that he is now in a state of decompensation."  "Defendant appeared to be extremely paranoid, and unable to contribute to meaningful dialogue in this case." As noted in the factual and procedural background above, in the course of the ensuing hearings, the trial court twice ordered Petitioner removed from the courtroom due to behavioral problems.

Psychologist Thomas Middleton, Ph.D., who had opined that Petitioner was competent in 2007, reported that Petitioner, now noncompliant with his medication, was "agitated and uncooperative on a continuing basis," and unable to appreciate the charges against him or to assist counsel in his own defense.  Accordingly, Dr. Middleton opined that Petitioner was not then

10

competent to stand trial.  Noting that correctional mental health staff described Petitioner "as one of the most chronically agitated and chronically aggressive inmates that they had seen at the facility," Middleton opined that Petitioner was "a danger to himself and others."

Psychologist Carol J. Hendrix, Ph.D., agreed that Petitioner was not competent to be tried.  He was unable to assist his attorney and could become disruptive in court.  Dr. Hendrix opined that due to his combined schizophrenia and personality disorder, Petitioner was presently dangerous and could shift into a "paranoid, angry, violent, and deadly mode very, very quickly."

In contrast, clinical psychologist Kathe Lundgren, Ed.D., opined that Petitioner was competent to stand trial.  Dr. Lundgren concluded that Petitioner understood the charges against him and was capable of assisting his attorney, but might not be "willing to participate and to behave himself in court."  Clinical neuropsychologist Eugene T. Couture, Ph.D. agreed with Dr. Lundgren that Petitioner was competent and was exaggerating his deficits to manipulate the system.

After the parties submitted the issue on the written reports, the trial court found Petitioner incompetent to stand trial.  The Kern County Mental Health Department found Petitioner to be unsuitable for outpatient treatment and recommended state hospital services.  Psychiatrist Robert Sincoff, M.D., certified:

> The treatment of [Petitioner] with involuntary psychotropic medications is medically appropriate.  His diagnosis at this time is Schizophrenia.  He will need medication to stabilize symptoms such as delusions.  At this point in time, there is no specific medications [*sic*] prescribed as the patient refuses any medication.  There is a substantial likelihood that this client will be restored to competency if medicated.  There is a substantial likelihood that restoration to competency cannot be achieved without such treatment.  The past efficacy of these medications is not known or has been inconsistent, but given the diagnosis and clinical presentation, treatment with these medications is medically indicated.  There are no medically indicated alternative treatments to address the mental health condition of this individual.
>
> The type of medication that would be most appropriate is antipsychotic medication.  The likely or potential side effects of these medications which are often noted are: drowsiness, dry mouth, constipation, blurry vision, difficulty urinating, muscle stiffness, slowed movements, tremor, restlessness, dizziness, weight gain, menstrual abnormalities, problems with sexual functioning and abnormal involuntary movements.  These side effects are unlikely

>to significantly interfere with the client's ability to assist in his defense at trial.

(These two paragraphs represent Dr. Sincoff's entire opinion.)

The court concluded that Petitioner was incompetent. It committed Petitioner to the Department of Mental Health pursuant to California Penal Code §§ 1370 and 1370.1 until he was restored to competency and ordered that "the treatment facility may administer antipsychotic medication to the defendant as prescribed by the treating psychiatrist."

Petitioner appealed the order for involuntary administration of antipsychotic drugs after he had been tried and convicted. Applying the *Sell* analysis and California Penal Code §§ 1370(a)(2) and 1370.01(a)(2), the California Court of Appeal concluded that although the trial court made all of the required statutory findings, "Dr. Sincoff's half-page medication recommendation is too generic to constitute substantial evidence to support those findings." *Fagan* at *8.

The Court finds no basis to conclude that the state appellate court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

## C.     **Impairment of Petitioner's Defense at Trial**

Despite its having rejected the trial court's imposition of involuntary antipsychotic medication, the Court of Appeals rejected Petitioner's contention that forced medication impaired his defense at trial. The appellate court distinguished the facts of Petitioner's case from the facts in *Riggins.*

First, the record did not indicate whether the jail psychiatrist continued to administer antipsychotic medication during Petitioner's trial. The court rejected Petitioner's argument that, in the absence of an order discontinuing involuntary administration of medication, the medication must have continued. The court relied on the language of § 1370, which authorizes a court that has found involuntary medication necessary to render a defendant competent to stand trial to

1 "issue an order authorizing the treatment *facility* to involuntarily administer antipsychotic medication . . . as prescribed by the . . . treating psychiatrist." *Fagan* at *11 (quoting Cal. Penal Code § 1370(a)(2)(B)(iii) (italics added)).  On its face, the order did not apply after Petitioner was restored to competency and returned to Superior Court custody.

Unlike *Riggins*, in which multiple physicians questioned the unusually high dosage of Mellaril being administered to Riggins and explained the effects of possible side effects on Riggins at trial, the record in Petitioner's case did not address the issue of how antipsychotic medication may have affected Petitioner's trial.  The sole evidence in the record was the May 18, 2010 certificate of competency and the associated psychological report.  Confirming that Petitioner could then stand trial, the report indicated that Petitioner was able to respond to "questions about matters of importance in the courtroom in a very competent manner." Petitioner's speech was slow but within normal limits; his thought process was linear, well directed and within normal limits, attention and concentration were unimpaired, and recent and remote memory were good to fair.  Petitioner denied thought disturbances, hallucinations, or other psychiatric phenomena.

In *Riggins*, the record indicated that Riggins continued to involuntarily receive an atypically high dosage of Mellaril, an antipsychotic drug, throughout his trial.  Four psychiatrists testified in detail regarding the high dosage that Riggins was receiving and the various side effects that Riggins might experience as a result of that dosage.  In contrast, the record in Petitioner's appeal did not disclose either the medication he was receiving or its dosage.  No experts testified regarding potential side effects of Petitioner's unknown medication.

Finally, Riggins presented an insanity defense and testified on his own behalf.  Petitioner neither claimed insanity nor testified.

The Court of Appeals bolstered their decision with a discussion of California state precedent before concluding that "[Petitioner] has not established any possibility, let alone 'a strong possibility,' that his defense was impaired due to the administration of antipsychotic drugs." *Fagan* at *15.

///

The Court finds no basis to conclude that the state appellate court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413. The Court finds the Court of Appeals' determination well-reasoned in light of the factual record and applicable Federal law. In short, the Court of Appeals appropriately determined that it could not find an impairment of Petitioner's defense at trial in light of the sparse record presented on appeal.

### D. Summary Reversal or Other Remedy

Petitioner contends that since the trial court ordered involuntary medication without substantial evidence to support the criteria required by *Sell*, his conviction is reversible *per se* pursuant to *Riggins*. Respondent counters that the California Court of Appeals correctly determined that even though the trial court's determination to medicate Petitioner involuntarily violated Petitioner's constitutional rights, reversal is not required since the evidence did not establish that involuntary administration of antipsychotic drugs to Petitioner resulted in his not receiving "a full and fair trial." *See Riggins*, 504 U.S. at 133.

This Court agrees that the error did not require reversal since Petitioner did not prove he was denied a full and fair trial. Petitioner has been misled by language in *Riggins* that appears to conflate two issues: (1) whether the trial court complied with procedures intended to ensure protection of a defendant's civil rights when determining whether to order involuntary antipsychotic medication to return the defendant to competency and (2) whether the involuntary administration of antipsychotic medication denied the defendant's constitutional right to a full and fair trial.

The Supreme Court's introductory paragraph in *Riggins* appears to define its holding solely as a question of the trial court's determination to order involuntary administration of antipsychotic medication:

> Petitioner David Riggins challenges his murder and robbery convictions on the ground that the State of Nevada unconstitutionally forced an antipsychotic drug upon him during

14

> trial. Because the Nevada courts failed to make findings sufficient to support forced administration of the drug, we reverse.

504 U.S. at 129.

The analysis applied in the course of the decision was not so simple. After recounting the case's factual and procedural background, the Court stated, "With these considerations in mind, we turn to Riggins' core contention that involuntary administration of Mellaril denied him 'a full and fair trial.'" *Id.* at 133. The Court's language suggests a two-stage analysis: (1) review of involuntary medication order and (2) evaluation of trial prejudice, if any. Petitioner does not provide any cases in which a court reversed a defendant's conviction solely as a result of involuntary antipsychotic medication administered prior to trial to restore competency. Nor has the Court has been able to identify any cases in which a court interpreted *Riggins* to require a *per se* reversal of a defendant's conviction in the absence of trial prejudice.

The *Riggins* Court began its analysis by reiterating its conclusions in *Harper* that the due process clause of the Fourteenth Amendment protects an individual's interest in avoiding involuntary administration of antipsychotic drugs and that, despite their therapeutic value, antipsychotic drugs could also produce "serious, sometimes fatal, side effects." *Riggins*, 504 U.S. at 134. Nonetheless, the State can satisfy the requirements of due process by demonstrating that administration of antipsychotic drugs is medically appropriate and considering less intrusive alternatives, necessary for the safety of the individual or others, or necessary to obtain a resolution of the individual's guilt or innocence. *Id.* at 135-36.

Disclaiming an intent to impose a strict scrutiny standard, the Court decried the trial court's failure to make a straightforward determination that involuntary medication was necessary to permit Riggins to be tried or that safety concerns outweighed Riggins' interest in freedom from medication. *Id.* at 136. Perhaps because of the unusual procedural status (originally, Riggins had voluntarily sought medication, but he sought to discontinue medication during trial), the trial court "simply weighed the risk that the defense would be prejudiced by change in Riggins' outward appearance against the chance that Riggins would become incompetent if taken off

///

Mellaril, and struck the balance in favor of involuntary medication," without ever acknowledging Riggins' liberty interest in freedom from antipsychotic drugs. *Id.* at 136-37.

The Court concluded that the error "may well have impaired the constitutionally protected trial rights that Riggins invokes," yet efforts to prove actual prejudice would be futile and guesses regarding alternative outcomes would be speculative. *Id.* at 137. Thus, in the absence of evidence that involuntary medication was necessary to accomplish an essential state interest, the Court concluded that prejudice had more likely than not occurred and reversed the case, remanding for a new trial.

In dissent, Justices Thomas and Scalia expressed concern that the majority opinion had conflated "two distinct questions: whether Riggins had a full and fair criminal trial and whether Nevada improperly forced Riggins to take medication." *Id.* at 146. The proper remedy, they urged, was to apply the same remedy sought in *Harper* -- that is, an award of damages and an injunction against further medication in a civil action under 42 U.S.C. § 1983. *Id.* at 153.

The Supreme Court implicitly embraced this formulation in *Sell*, holding that Sell's pre-trial appeal of the order for involuntary administration of antipsychotic medication was a collateral order sufficient to establish the 8th Circuit Court's jurisdiction. 539 U.S. at 176. Since the issue of involuntary medication is completely separate from the merits of the action, unrelated to questions of trial procedure, and effectively unreviewable in an appeal from a final judgment, appellate courts have jurisdiction to hear appeals from pre-trial orders for involuntary medication to help restore a defendant's competency before the defendant is tried. *Id.* at 177.

The problem of an effectively unreviewable order is present in Petitioner's case since the Court of Appeals held that the trial court erred in ordering involuntary administration of antipsychotic drugs but that no evidence supported a conclusion that the involuntary medication order resulted in trial prejudice. As in a case in which the defendant is acquitted after an erroneous order for involuntary medication, the facts of this case demonstrate the practicality of addressing a challenge to an involuntary medication order separately:

> [T]he question presented here, whether Sell has a legal right to avoid forced medication, perhaps in part because medication may make a trial unfair, differs from the question of whether forced

16

> medication *did* make the trial unfair. The first question focuses upon the right to avoid administration of the drugs. What may happen at trial is relevant, but only as a prediction . . . . . The second question focuses upon the right to a fair trial. It asks what *did* happen as a result of having administered the medication. An ordinary appeal comes too late for a defendant to enforce the first right; an ordinary appeal permits vindication of the second.

*Sell*, 539 U.S. at 177.

*See also United States v. Loughner*, 672 F.3d 731, 743 (9th Cir. 2012) (reviewing order for involuntary administration of antipsychotic medication as a collateral order); *United States v. Griffith*, 485 Fed.Appx. 857, 858 (9th Cir. 2012) (reviewing order for involuntary administration of antipsychotic medication as a collateral order).

The Court rejects Petitioner's unsupported contention that *Riggins* required the Court of Appeals to reverse his conviction solely because the trial court erred in entering an order for involuntary medication and without any showing of trial prejudice. The Court finds no basis to conclude that the state appellate court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

### IV. **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)   There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a

> criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability.

///

///

///

///

///

## V. Conclusion and Order

The Court hereby DENIES the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court declines to issue a certificate of appealability. The Clerk of Court is directed to enter judgment for the Respondent.

IT IS SO ORDERED.

Dated:   **August 25, 2015**                             **/s/ Sheila K. Oberto**
                                                     UNITED STATES MAGISTRATE JUDGE